**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| TIESHA SOR | : | |
| 2210 E. Fletcher St. | : | |
| Philadelphia, PA 19125 | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | No.:_____ |
| | : | |
| v. | : | |
| | : | |
| DRANOFF PROPERTIES, INC. | : | **JURY TRIAL DEMANDED** |
| 755 South Broad St. | : | |
| Philadelphia, PA 19147 | : | |
| and | : | |
| CARL DRANOFF | : | |
| c/o Dranoff Properties, Inc. | : | |
| 755 South Broad St. | : | |
| Philadelphia, PA 19147 | : | |
| | : | |
| Defendants. | : | |

_____:

## CIVIL ACTION COMPLAINT

Tiesha Sor (_hereinafter_ referred to as "Plaintiff," unless indicated otherwise) by and through her undersigned counsel, hereby avers as follows:

## INTRODUCTION

1.     Plaintiff has initiated this action to redress violations by Dranoff Properties, Inc. and Carl Dranoff (_hereinafter_ collectively referred to as "Defendants") of Section 1981 of the Civil Rights Act of 1866 ("Section 1981" – 42 U.S.C. § 1981), Title VII of the Civil Rights Act of 1964 ("Title VII" – 42 U.S.C. §§ 200d _et seq._), and the Pennsylvania Human Relations Act ("PHRA"). As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2.      This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws.

3.      This Court may properly assert personal jurisdiction over Defendants because their contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny.

4.      Pursuant to 28 U.S.C. § 1392(b)(1) and (b)(2), venue is properly laid in this district because Defendants are deemed to reside where they are subjected to personal jurisdiction, rendering Defendants residents of the Eastern District of Pennsylvania.

5.      Plaintiff is proceeding herein under Title VII and has properly exhausted is administrative remedies with respect to such claims by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety (90) days of receiving a notice of dismissal and/or right to sue letter from the EEOC. Plaintiff also exhausted her administrative remedies (with respect to her PHRA claims) because she timely filed Charges with the Pennsylvania Human Relations Commission (PHRC) and the charges have remained with the PHRC for over one year.

## PARTIES

6.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7.      Plaintiff is an adult individual, with an address as set forth in the caption.

8.      Defendant Dranoff Properties, Inc. (hereinafter "Defendant Entity") is a corporation that designs, builds, owns, and manages various residential real estate properties in Philadelphia. Its portfolio of properties includes luxury apartments, residential destinations, historic rehabilitations, and ground-up skyscrapers; and complex mixed-use projects that feature residences, restaurants, shops, theatres, and entertainment venues.

9.      Defendant Carl Darnoff (hereinafter "Defendant Dranoff") is the President and founder of Defendant Entity and is a high-level decision maker concerning terms and conditions of employment for employees (including Plaintiff) of Defendant Entity including but not limited to hiring, firing, and issuing discipline.

10.     At all times relevant herein, Defendants acted by and through their agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for the Defendants.

## FACTUAL BACKGROUND

11.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

12.     Plaintiff is a black (African American) female.

13.     Plaintiff was employed with Defendants for approximately ten (10) years.

14.     In or about March of 2010, Plaintiff was originally hired to work for Defendants as a leasing consultant.

15.     In or about 2014, Plaintiff was transitioned from a leasing consultant to a condo sales agent and remained in this role until 2018.

16.     While employed as a leasing consultant and as a condo sales agent, Plaintiff did not have much interaction with Defendant Dranoff and primarily reported to Director of Marketing and Sales, Mariann Harris (hereinafter "Harris")

17.     As a leasing consultant and a condo sales agent, Plaintiff performed her job well and generate great revenue for Defendants. For example, towards the end of her employment as a condo sales agent (before being promoted – discussed *infra*), Plaintiff had incredibly high sales after selling out units at one of Defendants' properties: One Riverside Condominiums.

18.     In or about June of 2018, Plaintiff was promoted to Director of Marketing and Sales.

19.     Prior to Plaintiff being promoted to Director of Marketing and Sales and during her time in such role, there were no other minorities on Defendants' Executive Team.

20.     Plaintiff believes and avers that she was promoted to Director of Marketing and Sales in June of 2018 out of necessity for the following reasons:

     i.  Defendants were in the process of launching a new project, named "Arthaus" – a high-rise luxury condominium building in Philadelphia;

     ii. Defendants needed funding for the Arthaus project;

     iii. While attempting to launch the Arthaus project, Defendants' then Director of Marketing and Sales, Mariann Harris (hereinafter "Harris"), had resigned;

     iv. It was difficult for Defendants to get funding for the Arthaus project when key roles were not filled – such as Director of Marketing and Sales;

     v.  Defendants needed to find a replacement for the role of Director of Marketing and Sales quickly; and

vi.   Plaintiff was the top leasing consultant and sales agent with Defendant Entity at the time of Harris' resignation.

21.     As a result of the foregoing, Plaintiff was selected for the role of Director of Marketing and Sales, where her primary focus would be on launching the Arthaus project.

22.     While Plaintiff was selected for the role of Director of Marketing and Sales in June of 2018, she did a lot of behind-the-scenes work, such as working with architects and the marketing company hired for the Arthaus project – the Brownstein Group (hereinafter referred to as "Brownstein")

23.     While employed with Defendants as the Director of Marketing and Sales, Plaintiff performed her job extremely well and Defendants' management never expressed any disciplinary or performance concerns.

24.     Despite her work ethic and dedication, Plaintiff's work environment was tainted by the constant discriminatory animus that Defendant Entity's management, including Defendant Dranoff exhibited towards Plaintiff and others because of their race – particularly those who are African American/black.

25.     For example, after working one year behind the scenes preparing for the launch of the Arthaus project, the opening of the sales office was quickly approaching, and it was time to hire what would be the faces of the new project: the sales and supportive team.

26.     In the process of scouting potential candidates for the Arthaus project's lead sales agent, Plaintiff located two candidates who she believed would be great for the position. Both of these candidates were African American/black – one was a male and one was a female.

27.     The African American male candidate, hereinafter referred to as "DH"[1] had worked for Defendants in a non-managerial leasing role distanced from the executive team and corporate office (such as Plaintiff during the beginning of her employment). This individual proved to be a high performer and was already aware of Defendant Entity's procedures.

28.     When DH confirmed his interest in joining the sales team for the Arthaus project, Plaintiff shared her thoughts with Defendant Dranoff and suggested that he be hired for the lead sales agent position for such project.

29.     Defendant Dranoff responded to Plaintiff's suggestion that DH be hired for the Arthaus sales team with disdain and disgust and told Plaintiff she could not hire DH because he did not fit the description of a salesperson for multi-million-dollar condos. Defendant Dranoff proceeded to say that his buyers (mostly Caucasian) would not relate to DH and that he did not have "the look."

30.     Plaintiff was shocked by Defendant Dranoff's discriminatory statement regarding DH. In response to seeing Plaintiff's clear face of shock in response to his statements, Defendant Dranoff then backtracked and stated that DH did not have the experience for the position. When Plaintiff responded by stating that DH had the same level of experience as she had when promoted into the role of Director of Marketing and Sales (plus an engineering degree), Defendant Dranoff again stated that DH did not have the look, and buyers (again, primarily Caucasian) would not relate or respect his opinion.

31.     The second candidate that Plaintiff suggested for the Arthaus sales team was "TG," an African American female who was an independent realtor with property management experience.

---

[1] Plaintiff will refer to employment candidates and hires by their initials for privacy reasons.

32.     When Defendant Dranoff learned that Plaintiff was interviewing TG for a position on the Arthaus sales team (after having walked through the space where Plaintiff was conducting TG's in-person interview), he stated without even knowing any of her experience or skills that (1) she was not the "right fit;" (2) she "didn't have the right look;" (3) she did not "present as sophisticated"; and (4) his buyers would not relate to her or trust her.

33.     In response to his discriminatory assessment of TG, Plaintiff explained to Defendant Dranoff that TG was the best candidate that she had interviewed, possessed all the qualities of a top sales agent, and would excel if given the opportunity. In response, Defendant Dranoff became agitated and frustrated with Plaintiff and instructed her not to hire TG, especially for the role of lead sales agent and that she needed to continue looking for other candidates.

34.     Plaintiff continued to search for other candidates for the Arthaus sales team, and after much searching informed Defendant Dranoff that TG was still the best candidate for the role of lead sales agent. Defendant Dranoff became furious with Plaintiff and told her that TG could not be considered for the lead sales agent position., as she did not have a "sophisticated appearance" that buyers would "trust or relate."

35.     Plaintiff was very offended by Defendant Dranoff's derogatory statements regarding TG,  objected to his aforesaid discriminatory comments and hiring practices and pushed back stating (1) if his statements were true, then his buyers at One Riverside (another property owned by Defendants) would not have related to her (as she is also African American), but that she was the top sales person at the project with many of his personal associates providing praise on their experience with her; (2) she found TG to be very sophisticated, she was well spoken and very polished with her style and demeanor; and (3) current day people of privilege are well traveled

and some of the highest end brands and companies employ a ***diverse*** staff; and (4) he was wrong in his assessment.

36.     At this point it was clear that Defendant Dranoff knew Plaintiff was offended by his discriminatory assessment and statements regarding TG, agreed to interview her (in order to pacify Plaintiff), but still instructed Plaintiff to follow his direction and find someone for the Arthaus lead sales agent position who resembled VJ or PR (both previous female employees of Defendants who were Caucasian).

37.     When Plaintiff found a salesperson that Defendant Dranoff would accept as a potential candidate for the lead sales agent position (a white female – hereinafter referred to as "CC"), Defendant Dranoff asked what she looked liked before even asking about her credentials. Once Plaintiff shared what the potential candidate looked like, Defendant Dranoff expressed excitement over interviewing her.

38.     Before interviewing CC, Defendant Dranoff meet with TG (in order to pacify Plaintiff – as discussed *supra*); however, he only met with her for five minutes and then told Plaintiff that she was not the right fit for the position.

39.     Defendant Dranoff then interviewed CC for approximately one hour and thereafter instructed Plaintiff to offer CC the position of lead sales agent for the Arthaus project.

40.     After Defendant Dranoff cleared CC for the lead sales agent of the Arthaus project, Plaintiff once again approached Defendant Dranoff and asked him to at least meet with TG.

41.     In addition to the aforesaid racial discriminatory comments and hiring practices (discussed *supra*), Plaintiff also observed and was subjected to other forms of racial discriminatory animus while employed with Defendants as the Director of Marketing and Sales. For example, but not intending to be an exhaustive list:

8

a.  Shortly after being hired as the Director of Marketing and Sales, Caryn Connelly (hereinafter "Connelly" - Caucasian), the VP of Finance for Defendant Entity, stopped by Plaintiff's office and proceeded to inform Plaintiff that while she was attending a meeting with Director of Operations – David Smith (hereinafter "Smith" – Caucasian), Leasing Manager – Michael Purcell (hereinafter "Purcell" – Caucasian,) and the company attorney to discuss a racial discrimination lawsuit that had been filed against Defendant Entity, Purcell informed Connelly that Plaintiff was African American (as they thought it may be helpful for their defense to the lawsuit that someone in upper management was African American). Connelly informed Plaintiff that she had no idea that she [Plaintiff] was African American and tried to dispute the same with Purcell.  Connelly then proceeded to awkwardly apologize to Plaintiff for not knowing that she was African American.[2] This conversation with Connelly was degrading, humiliating, awkward and offensive;

b.  Throughout her employment as Director of Marketing and Sales, Plaintiff's input and suggestions were often overlooked or ignored (unlike her Caucasian counterparts);

c.  On one occasion, Plaintiff and Defendant Dranoff both attended a public event (the Academy Ball) separately. Plaintiff was the guest of Philly Magazine and attended with a date (an African American male). The following Monday after the Academy Ball, Defendant Dranoff approached Plaintiff and began asking her a barrage of questions, including how she was able to attend the ball, who

---

[2] Connelly is Defendant Dranoff's "right hand" involved in most company decisions including promoting and terminating.

invited her, was that her escort (referring to my date), and whether that was her first time at the Academy of Music. He then proceeded to inform Plaintiff that the only reason Philly Magazine invited her to the event was because of him. The entire conversation was degrading, humiliating, and offensive (as if Plaintiff was not good enough – as a black female – to be invited by Philly Magazine to the Academy Ball and a white male had to be behind the reason she was invited in the first place);

d. Plaintiff reported on multiple occasions throughout November and December of 2019 to Defendant Dranoff that CC was performing very poorly, that she was unable to sell any units for the Arthaus project, and that Plaintiff to have to step in and close deals for her. Plaintiff suggested that Defendants find someone else for the Arthaus project's lead sales agent role, but Defendant Dranoff refused to listen to Plaintiff's concerns and continued to tell Plaintiff to just keep training CC. Therefore, Plaintiff continued to do all of her job duties and several of CC's job duties during the next few months because Defendant Dranoff refused to listen to Plaintiff's concerns regarding the Caucasian female that Defendant Dranoff insisted on hiring over a black female;

e. In or February of 2020 a Caucasian realtor, who was not even employed with Defendants complained that CC was a horrid salesperson. When Defendant Dranoff learned of this Caucasian realtor's complaint, he lashed out at Plaintiff and acted as if it was the first time he had been informed of CC's poor performance. It was only at after this Caucasian realtor complained of CC that

Defendants decided to terminate her (even though Plaintiff had been expressing concerns about her for months)[3];

f.  Outside marketing companies even took notice of Defendants' racial discriminatory bias. For example, during marketing meetings, outside marketing companies would advise Defendants that they needed to be more inclusive and that everything Defendant Dranoff projects is "white male." Even Brownstein informed Defendant Dranoff that he needed to be more inclusive and highlighted that fact that there were no minorities or women in his marketing of the Arthaus project; and

g.  It was very clear through communications, interactions, and observations with Defendant Dranoff that Defendants were only comfortable with Caucasian males or females being the face of the Arthaus project and what it represents.

42.    In or about November of 2019, the sales office for the Arthaus project opened and Plaintiff remained behind the scenes for the most part until it was realized that Plaintiff would have to have more of a physical presence on the sales team (and thus become the face of the Arthaus project).

43.    It was at this point that Plaintiff was abruptly informed that she was being terminated from her employment with Defendants.

44.    On or about March 30, 2020, Plaintiff was informed via telephone by Defendant Dranoff that she was being terminated from her employment after years of hard work and dedication.

---

[3] CC was replaced by another Caucasian individual shortly before Plaintiff's termination – discussed further *infra*.

45.     During the aforesaid March 30, 2020 termination call (discussed *supra*), Defendant Dranoff praised Plaintiff for her work and accomplishments while employed with Defendants and even offered to write her a positive recommendation letter.

46.     When Plaintiff asked for the reason she was being terminated, Defendant Dranoff could not provide one other than to say that it was something he had been thinking of for a while and then proceeded to tell her that she was being replaced by Harris (the former Caucasian Director of Marketing and Sales who had previously resigned).

47.     Since being terminated, Plaintiff has heard a multitude of reasons for her termination, including performance (which is absurd, as Plaintiff was a stellar performer).

48.     The latest reason provided by Defendants for Plaintiff's termination was made in Defendants' response to Plaintiff's complaint filed with the PHRC, wherein Defendants claimed that Plaintiff was terminated for "for financial reasons and because of her failure to obtain a broker's license."

49.     The reasoning provided by Defendants in response to Plaintiff's PHRC complaint is entirely pretextual and clearly fabricated as a way to try and conceal the discriminatory motive behind Plaintiff's termination.

50.     For example:

      i.   It is highly likely that Harris is being paid more than Plaintiff (if not the same as her) as the Director of Marketing and Sales and therefore the alleged "financial reason" for Plaintiff's termination does not make any sense;

      ii.  When Plaintiff was offered the position of Director of Marketing and Sales, she was never informed that it would be a requirement of her job to obtain

a broker's license, and in fact the only thing her offer letter states about a broker's license is that she would receive a $10,000 bonus upon obtaining one;

iii.   Plaintiff was in the process of earning a broker's license and only had two classes to complete before obtaining such license – a fact that Defendant Entity's management, including Defendant Dranoff, was aware of before her termination;

iv.   Plaintiff was never informed at any point during her employment that if she did not obtain a broker's license by a specific date, she would be terminated;

v.   Even if not having a broker's license was the actual reason for Plaintiff's termination (which it clearly is just a fabricated pretextual reason), Plaintiff still could have worked for Defendants as a leasing consultant either on the Arthaus project (as she had already sold units for said project) or at another complex, but this option was never offered to her and instead she was just abruptly terminated; and

vi.   It is clear that when it came time for Plaintiff to be more physically present to buyers for the Arthaus project, Defendant Dranoff reverted back to what he was comfortable with – someone who was Caucasian and that Plaintiff's lack of a broker's license had nothing to do with her termination.

50.   Plaintiff believes and therefore avers that she was terminated because of her race and/or for objecting to/expressing concerns of racial discrimination within Defendant Entity (and by Defendant Dranoff).

**COUNT I**
**Violations of 42 U.S.C. Section 1981**

**([1] Race Discrimination; [2] Hostile Work Environment; and [3] Retaliation)**
**-Against Both Defendants-**

51.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

52.     During Plaintiff's employment with Defendants (specifically after assuming the position of Director of Marketing and Sales), she observed and was subjected to racial discrimination by Defendants (discussed *supra*).

53.     Plaintiff expressed concerns of racial discriminatory animus to Defendant Dranoff while attempting to hire two different African American candidates for the Arthaus project sales team – discussed in Paragraphs 24-39 of the instant Civil Action Complaint.

54.     Defendant Dranoff was dismissive of Plaintiff's aforesaid concerns of discrimination and continued instructing her to hire individuals who looked like two other former Caucasian female leasing consultants who previously worked for Defendants.

55.     On or about March 30, 2020, Plaintiff was abruptly terminated from her employment with Defendants without any logical or reasonable explanation.

56.     In fact, the reason for Plaintiff's termination has changed since March 30, 2020, with Defendants now offering that the purported reason for termination was "financial reasons and failure to obtain a broker's license" – which are both completely pretextual reasons.

57.     Plaintiff believes and therefore avers that her race was a determinative and/or motivating factor in Defendants' decision to terminate her.

58.     Plaintiff also believes and therefore avers that she was terminated in retaliation for objecting to or expressing concerns of racial discrimination to Defendant Dranoff.

59.     Defendant Dranoff is individually liable because he intentionally considered Plaintiff's race as a motivating or determinative factor in making the decision to terminate her

and/or because he intentionally terminated Plaintiff due to her complaints of/objections to race discrimination.

60.     These actions as aforesaid constitute unlawful discrimination, retaliation, and a hostile work environment under Section 1981.

**COUNT II**
**Violations of Title VII**
**([1] Race Discrimination; [2] Hostile Work Environment; and [3] Retaliation)**
**-Against Defendant Entity Only-**

60.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

61.     During Plaintiff's employment with Defendants (specifically after assuming the position of Director of Marketing and Sales), she observed and was subjected to racial discrimination by Defendants (discussed *supra*).

62.     Plaintiff expressed concerns of racial discriminatory animus to Defendant Dranoff while attempting to hire two different African American candidates for the Arthaus project sales team – discussed in Paragraphs 24-39 of the instant Civil Action Complaint.

63.     Defendant Dranoff was dismissive of Plaintiff's aforesaid concerns of discrimination and continued instructing her to hire individuals who looked like two other former Caucasian female leasing consultants who previously worked for Defendants.

64.     On or about March 30, 2020, Plaintiff was abruptly terminated from her employment with Defendants without any logical or reasonable explanation.

65.     In fact, the reason for Plaintiff's termination has changed since March 30, 2020, with Defendants now offering that the purported reason for termination was "financial reasons and failure to obtain a broker's license" – which are both completely pretextual reasons.

66.     Plaintiff believes and therefore avers that her race was a determinative and/or motivating factor in Defendants' decision to terminate her.

67.     Plaintiff also believes and therefore avers that she was terminated in retaliation for objecting to or expressing concerns of racial discrimination to Defendant Dranoff.

68.     These actions as aforesaid constitute unlawful discrimination, retaliation, and a hostile work environment under Title VII.

**COUNT III**
**Violations of the PHRA**
**([1] Race Discrimination; [2] Hostile Work Environment; and [3] Retaliation)**
**-Against Both Defendants-**

69.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

70.     During Plaintiff's employment with Defendants (specifically after assuming the position of Director of Marketing and Sales), she observed and was subjected to racial discrimination by Defendants (discussed *supra*).

71.     Plaintiff expressed concerns of racial discriminatory animus to Defendant Dranoff while attempting to hire two different African American candidates for the Arthaus project sales team – discussed in Paragraphs 24-39 of the instant Civil Action Complaint.

72.     Defendant Dranoff was dismissive of Plaintiff's aforesaid concerns of discrimination and continued instructing her to hire individuals who looked like two other former Caucasian female leasing consultants who previously worked for Defendants.

73.     On or about March 30, 2020, Plaintiff was abruptly terminated from her employment with Defendants without any logical or reasonable explanation.

74.     In fact, the reason for Plaintiff's termination has changed since March 30, 2020, with Defendants now offering that the purported reason for termination was "financial reasons and failure to obtain a broker's license" – which are both completely pretextual reasons.

75.     Plaintiff believes and therefore avers that her race was a determinative and/or motivating factor in Defendants' decision to terminate her.

76.     Plaintiff also believes and therefore avers that she was terminated in retaliation for objecting to or expressing concerns of racial discrimination to Defendant Dranoff.

77.     Defendant Dranoff is individually liable because he aided, abetted and personally participated in the discriminatory/retaliatory actions asserted herein.

78.     These actions as aforesaid constitute unlawful discrimination and retaliation, and a hostile work environment under the PHRA.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.     Defendants are to promulgate and adhere to a policy prohibiting discrimination and retaliation in the future against any employee(s);

B.     Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

C.     Plaintiff is to be awarded punitive damages as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their

willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

        D.     Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper and appropriate (including but not limited to damages for emotional distress, pain, suffering and humiliation); and

        E.     Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law.

        F.     Plaintiff is to be awarded any and all statutory enhancements available as a matter of law.

        G.     Plaintiff demands trial by jury on all issues so triable consistent with Fed. R. Civ. P. 38(a)(1).

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: _____
Ari R. Karpf, Esq.
3331 Street Rd.
Two Greenwood Square, Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated:  April 12, 2022

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

|  |  |  |
|---|---|---|
| Tiesha Sor | : | CIVIL ACTION |
| v. | : |  |
| Dranoff Properties, Inc., et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.                                        ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.                                                                                                       ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court.  (See reverse side of this form for a detailed explanation of special
management cases.)                                                                                                         ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.          (X )

| 4/12/2022 | | Plaintiff |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 639-0801 | (215) 639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

UNITED STATES DISTRICT COURT
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

### DESIGNATION FORM

*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: ___2210 E. Fletcher Street, Philadelphia, PA 19125___

Address of Defendant: ___755 South Broad Street, Philadelphia, PA 19147___

Place of Accident, Incident or Transaction: ___Defendants place of business___

---

*RELATED CASE, IF ANY:*

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?     Yes ☐    No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?     Yes ☐    No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?     Yes ☐    No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?     Yes ☐    No ☒

I certify that, to my knowledge, the within case ☐ is / ☒ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: ___4/12/2022___ _____    ___ARK2484 / 91538___

       *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.**    *Federal Question Cases:*                  **B.**    *Diversity Jurisdiction Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts     ☐ 1. Insurance Contract and Other Contracts
☐ 2. FELA     ☐ 2. Airplane Personal Injury
☐ 3. Jones Act-Personal Injury     ☐ 3. Assault, Defamation
☐ 4. Antitrust     ☐ 4. Marine Personal Injury
☐ 5. Patent     ☐ 5. Motor Vehicle Personal Injury
☐ 6. Labor-Management Relations     ☐ 6. Other Personal Injury *(Please specify):* _____
☒ 7. Civil Rights     ☐ 7. Products Liability
☐ 8. Habeas Corpus     ☐ 8. Products Liability – Asbestos
☐ 9. Securities Act(s) Cases     ☐ 9. All other Diversity Cases
☐ 10. Social Security Review Cases            *(Please specify):* _____
☐ 11. All other Federal Question Cases
     *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, ___Ari R. Karpf___ , counsel of record *or* pro se plaintiff, do hereby certify:

☒   Pursuant to Local Civil Rule 53.2, § 3(c ) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐   Relief other than monetary damages is sought.

DATE: ___4/12/2022___ _____    ___ARK2484 / 91538___

       *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

SOR, TIESHA

### DEFENDANTS

DRANOFF PROPERTIES, INC., ET AL.

**(b)** County of Residence of First Listed Plaintiff    Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Philadelphia
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Karpf, Karpf & Cerutti, P.C.; 3331 Street Road, Two Greenwood Square, Suite 128, Bensalem, PA 19020; (215) 639-0801; akarpf@karpf-law.com

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

1   U.S. Government Plaintiff

X 3   Federal Question
*(U.S. Government Not a Party)*

2   U.S. Government Defendant

4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC 881 | 422 Appeal 28 USC 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury - | 690 Other | 423 Withdrawal | 376 Qui Tam (31 USC |
| 130 Miller Act | 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| 140 Negotiable Instrument | Liability | 367 Health Care/ | | | 400 State Reapportionment |
| 150 Recovery of Overpayment | 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | 820 Copyrights | 430 Banks and Banking |
| 151 Medicare Act | 330 Federal Employers' | Product Liability | | 830 Patent | 450 Commerce |
| 152 Recovery of Defaulted | Liability | 368 Asbestos Personal | | 835 Patent - Abbreviated | 460 Deportation |
| Student Loans | 340 Marine | Injury Product | | New Drug Application | 470 Racketeer Influenced and |
| (Excludes Veterans) | 345 Marine Product | Liability | | 840 Trademark | Corrupt Organizations |
| 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | 480 Consumer Credit |
| of Veteran's Benefits | 350 Motor Vehicle | 370 Other Fraud | 710 Fair Labor Standards | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 160 Stockholders' Suits | 355 Motor Vehicle | 371 Truth in Lending | Act | 862 Black Lung (923) | 850 Securities/Commodities/ |
| 190 Other Contract | Product Liability | 380 Other Personal | 720 Labor/Management | 863 DIWC/DIWW (405(g)) | Exchange |
| 195 Contract Product Liability | 360 Other Personal | Property Damage | Relations | 864 SSID Title XVI | 890 Other Statutory Actions |
| 196 Franchise | Injury | 385 Property Damage | 740 Railway Labor Act | 865 RSI (405(g)) | 891 Agricultural Acts |
| | 362 Personal Injury - | Product Liability | 751 Family and Medical | | 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| 210 Land Condemnation | 440 Other Civil Rights | **Habeas Corpus:** | 791 Employee Retirement | 870 Taxes (U.S. Plaintiff | 896 Arbitration |
| 220 Foreclosure | 441 Voting | 463 Alien Detainee | Income Security Act | or Defendant) | 899 Administrative Procedure |
| 230 Rent Lease & Ejectment | X 442 Employment | 510 Motions to Vacate | | 871 IRS—Third Party | Act/Review or Appeal of |
| 240 Torts to Land | 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| 245 Tort Product Liability | Accommodations | 530 General | | | 950 Constitutionality of |
| 290 All Other Real Property | 445 Amer. w/Disabilities - | 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | 462 Naturalization Application | | |
| | 446 Amer. w/Disabilities - | 540 Mandamus & Other | 465 Other Immigration | | |
| | Other | 550 Civil Rights | Actions | | |
| | 448 Education | 555 Prison Condition | | | |
| | | 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

X 1 Original Proceeding

2 Removed from State Court

3 Remanded from Appellate Court

4 Reinstated or Reopened

5 Transferred from Another District *(specify)*

6 Multidistrict Litigation - Transfer

8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Section 1981 (42USC1981); Title VII (42USC2000)

Brief description of cause:
Violations of the Section 1981, Title VII and the PHRA.

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   X Yes    No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE   4/12/2022

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #           AMOUNT           APPLYING IFP           JUDGE           MAG. JUDGE

| Print | Save As... | Reset |